IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| J. C. WOODALL, #185587, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:03-CV-489-F |
| ) | |
| RALPH HOOKS, *et al.*, ) | |
| ) | |
| Respondents. ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION AND PROCEDURAL HISTORY**

This cause is before the court on a 28 U.S.C. § 2254 petition for habeas corpus relief filed by J. C. Woodall ("Woodall"), a state inmate, on May 5, 2003. In this petition, Woodall challenges a conviction for capital murder imposed upon him by the Circuit Court of Elmore County, Alabama on June 21, 2001.[1] The trial court sentenced Woodall to life

---

[1] "On July 14, 1989, an Elmore County grand jury returned a four-count indictment against J.C. Woodall, charging him with two counts of capital murder, under §§ 13A-5-40(a)(2) and (a)(7), Ala.Code 1975 (robbery-murder and murder-for-hire), in connection with the death of his mother, Clemer Woodall; and one count each of the noncapital offenses of attempted murder, §§ 13A-6-2, 13A-4-2, Ala.Code 1975, and assault in the first degree, § 13A-6-20, Ala.Code 1975, in connection with the shooting of his brother, Elmer Woodall. The defendant was arrested in Kansas, and Alabama authorities sought his return in order to have him stand trial. After protracted extradition challenges in the state and federal courts in Kansas, see *Kennon v. State,* 248 Kan. 515, 809 P.2d 546 (1991); *Kennon v. Hill,* 44 F.3d 904 (10th Cir.), cert. den., 515 U.S. 1146, 115 S.Ct. 2586, 132 L.Ed.2d 835 (1995), J.C. Woodall was delivered to Alabama authorities. In December 1995, after a trial in the Elmore County Circuit Court, he was convicted of capital murder on the count based upon § 13A-5-40(a)(7) and was convicted of attempted murder." *Ex parte Woodall*, 730 So.2d 652, 656-657 (Ala. 1998). The Alabama Supreme Court reversed and remanded Woodall's 1995 capital murder conviction. *Id*. at 666. The conviction which Woodall now challenges occurred upon his re-trial for the capital murder of his mother.

imprisonment without parole for this conviction.

Woodall filed a direct appeal of his 2001 capital murder conviction in which he raised the following claims for relief: (i) the trial court erred when, over his objection, it admitted the testimony of Freddie Glenn Pope ["Pope"] and John Kennon ["Kennon"] from the 1995 transcript; and (ii) the State failed to present sufficient evidence to support a conviction for capital murder. On April 19, 2002, the Alabama Court of Criminal Appeals affirmed Woodall's capital murder conviction. *See Respondents' Exhibit D - Memorandum Opinion of the Alabama Court of Criminal Appeals*. The relevant portion of this decision reads as follows:

> Both the State and the appellant's defense counsel adopted the facts contained in this Court's first opinion following the appellant's first trial. Those facts are as follows [sic]:
>
> "In this case the defendant, J.C. Woodall, hired Freddie Glenn Pope to kill his brother Elmer 'Stormy' Woodall and his eighty-one year old mother, Clemer E. Woodall. The gunman, Freddie Glenn Pope carried out the contract by shooting to death Clemer Woodall and by attempting to kill Elmer 'Stormy' Woodall, who survived gunshot wounds to the head.
>
> "The evidence established that J.C. Woodall was engaged in a long-term dispute with other Woodall family members over certain real property located in Elmore County, Alabama, near the city of Tallassee. The defendant developed an anger or hatred for his youngest brother, Elmer 'Stormy' Woodall, due to Stormy's acquisition of the family property.
>
> "The property dispute involved litigation which was ultimately settled through J. C. Woodall's attorney, Robert Alton. During settlement efforts or in conjunction with the ultimate settlement, Elmer 'Stormy' Woodall mailed a sketch of the subject thirty-seven acre tract of land to his brother, J.C.

Woodall, who lived in the state of Kansas. The sketch map was colored in a distinguishable manner to identify the land in question. Elmer 'Stormy' Woodall testified that the triggerman, Freddie Glenn Pope, had possession of that map when Pope stopped by his residence located at Rt. 3, Box 231, Tallassee, Alabama, inquiring about some gravel. Under the pretense of desiring to purchase some gravel, Pope visited the would-be site of the murders in order to locate the person he was to kill and make preparation for the hit.

"Between March and April, 1989, J.C. Woodall requested long-time acquaintance John Kennon to come to Alabama to take care of a problem that he had with a certain person who had beaten him out of some land, and had given him some problems which caused him to lose a lot of money. John Kennon refused the request but assisted J.C. Woodall by locating Freddie Glenn Pope.

"In April of 1989, John Kennon introduced J.C. Woodall to Freddie Glenn Pope. J.C. Woodall sought the assistance of Freddie Glenn Pope to kill a man in Alabama. Pope dealt with J.C. Woodall in a manner designed to hide the fact that Pope intended to personally handle the contract killing. Consequently, Pope led J.C. Woodall to believe that an unidentified third party was to be paid for committing the murder when, in fact, Pope was the true hiree who ultimately came to Alabama for the purpose of killing Elmer 'Stormy' Woodall and Clemer Woodall. The testimony of Pope was that J.C. Woodall paid $3,500.00 to him for the commission of the murder and attempted murder.

"On or about May 30, 1989, J.C. Woodall accompanied by his lady friend, Ruby Fennigan, came to Alabama. On this date J.C. Woodall conveyed to his mother, Clemer Woodall, a life estate in the thirty-seven acres of land. Elmer 'Stormy' Woodall testified that the conveyance surprised him because it was not a part of the settlement agreement reached between the parties to the land dispute. The conveyance of the life estate to Clemer Woodall was made after the murder for hire contract was entered into between J.C. Woodall and Freddie Glenn Pope.

"On June 24, 1989, Freddie Glenn Pope arrived in Alabama and on June 25, 1989, he checked into the Budgetel Inn in Montgomery, Alabama.

3

Exhibits were introduced into evidence corroborating Pope's oral testimony regarding his stay in the motel. Pope located the residence of the man he was employed to kill. While scoping the ultimate crime scene, Pope noticed from the appearances of things at the residence that another person was there. After making this observation, Pope telephoned J.C. Woodall in an effort to determine who was present at the residence in addition to the man he was supposed to kill. The telephone company records were introduced corroborating Pope's testimony and matching the telephone number of J.C. Woodall for at least one of the calls Pope made to J.C. Pope was told by J.C. Woodall that the person was probably the sister of the man Pope was employed to kill. In another telephone conversation between Pope and J.C. Woodall, when the subject of the continued presence of another person was mentioned by Pope, J.C. told Pope that 'if she gets in the road she has got to go.' Pope understood this to mean that whoever was present when the murder took place would have to be killed so that there would be no witnesses. The evidence establishes that J.C. Woodall knew that his mother lived with his brother and, therefore, would likely be present when Freddie Glenn Pope executed the contract for murder. The State argued to the jury that J.C. Woodall deeded to his mother a life estate in the disputed property because he knew she would be killed by Freddie Glenn Pope in accordance with the contract to kill Elmer 'Stormy' Woodall. Pope was told by J.C. Woodall that the man he was to kill lived alone. Accordingly, when Pope complained to J.C. Woodall of another person's presence at the residence, he was instructed to kill that person also as indicated above.

"On Monday, June 26, 1989 at approximately 3:30 p.m., Freddie Glenn Pope arrived at Rt. 3, Box 231, Tallassee, Alabama for the purpose of performing the contract killings. Pope shot Elmer 'Stormy' Woodall in the head twice. Clemer Woodall was present and saw Pope shoot her youngest son. Clemer began to cry out or scream and Pope then fatally shot her in the head. Pope believed that both of his shooting victims were dead when he left the scene of the crime. However, Elmer 'Stormy' Woodall survived the shooting and provided the investigators valuable information about the killer. This information included observation of a wheat symbol on Pope's car tag and his possession of the sketch map of the property. Those tips, along with clever investigative work by local law enforcement and the Alabama Bureau of Investigation ultimately led to the identification and arrest of Freddie Glenn Pope, John Kennon, and J.C. Woodall.

*Woodall v. State*, 730 So.2d [627, 632-634 (Ala.Cr.App. 1997].

I.

The appellant argues that the trial court erred in allowing into evidence that portion of the transcript of his first trial which contained the testimony of two deceased State's witnesses, Freddie Glenn Pope and John Kennon. In support of his argument, he contends that the admission of the testimony violates Rule 403 of the Alabama Rules of Evidence because the probative value of the evidence was substantially outweighed by its prejudicial impact.

Additionally, he argues that the former testimony should have been excluded because it contained statements made by co-conspirators. Lastly, he argues that the admission of the testimony violated his right to confrontation of the witnesses against him.

In *Bush v. State*, 695 So.2d 70, 125 (Ala. Crim. App. 1996), this Court reiterated the general rule regarding the introduction of former testimony as follows:

> "Testimony of a witness, in a former trial or action, given (1) under oath, (2) before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross-examination, (3) under circumstances affording the party against whom the witness was offered an opportunity to test his credibility by cross-examination and (4) given in a litigation in which the issues and parties were substantially the same as in the present cause, is receivable as evidence in the present trial (5) when the personal attendance of the witness to testify in the present trial is not feasible. . . .
>
> "In order for former testimony to be admissible in present litigation, proof must be made to the reasonable satisfaction of the trial judge that the personal attendance of the witness at court is not procurable or, if procurable, is ineffective, in consequence of legally recognized causes, to procure his testimony. The following cases of nonproduction of the witness have been held sufficient: that the witness is dead; that the witness is permanently or indefinitely absent from the state;

5

> that the witness cannot be found after diligent search; that the witness is in military service in time of war; that the witness is now ill and, in all probability, will never be able to testify again; that the opponent has caused the witness to be absent; that the witness is now insane; that the witness has become disqualified by facts occurring subsequent to the former trial if, but only if, the party now offering the former testimony is not responsible for such disqualification and that the witness now avails himself or herself of a privilege not to testify."

*Id*.

Because the testimony was highly probative, and it is legally permissible to introduce evidence from a previous trial if the witnesses are deceased, and because the appellant had been afforded his right to confront the witnesses through sifting cross-examination at the previous trial, no error occurred in the trial court's allowing into evidence the former testimony.

The appellant's argument that the witnesses' testimony should not have been admitted because each involved statements made by co-conspirators, was not presented to the trial court, and was, therefore, not preserved for appellate review. See *Parker v. State*, 777 So. 2d 937 (Ala. Crim. App. 1999). Additionally, the appellant's argument that he was denied his right to confrontation of the witnesses against him was not presented to the trial court and was, thus, not preserved for appellate review. *Bowles v. State*, 783 So. 2d 1077 (Ala. Crim. App. 2000) (A defendant is bound by the grounds of objection stated at trial and may not expand those grounds on appeal.)

II.

The appellant argues that the State presented insufficient evidence to sustain his conviction for capital murder because there was insufficient evidence to prove that he intended for the "hit man", whom he hired to kill his brother, to also kill his mother. He contends that he hired the "hit man" only to kill his brother.

The Alabama Supreme Court discussed this issue in *Ex parte Woodall*, 730 So. 2d 652, 658[-659] (Ala. 1998):

> "'[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony. *Ritter v. State,* 375 So.2d 270 (Ala.1979). An accomplice to the intentional killing is one who aids and abets the killing by any assistance rendered through 'acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.' *Id.* at 274."

*Ex parte Raines,* 429 So.2d 1111, 1112 (Ala.1982). Thus, one who hires another to commit a murder may be convicted of the capital offense delineated by § 13A-5-40(a)(7), Ala.Code 1975, under the doctrine of accomplice liability. See *Haney v. State,* 603 So.2d 368, 380 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); see also § 13A-2-23, Ala.Code 1975. "The accomplice ... is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy formed," but "[he] is not responsible for any special act, not within the scope of the common purpose, but grow[ing] out of the individual malice of the perpetrator. 1 Wharton Crim.Law, § 397." *Keller v. State,* 380 So.2d 926, 935 (Ala.Cr.App.1979), cert. denied, 380 So.2d 938 (Ala.1980).

The capital offense of which this defendant was convicted, see § 13A-5-40(a)(7), Ala.Code 1975, requires (1) proof of an intentional murder and (2) proof that the murder was committed for pecuniary gain, or pursuant to a contract, or for hire. *Sockwell v. State,* 675 So.2d 4, 24 (Ala.Cr.App.1993). We agree with the defendant that his intent that Pope kill Elmer Woodall pursuant to a contract could not supply the intent necessary to convict the defendant for the capital murder-for-hire of Clemer Woodall. Cf. *Tomlin v. State,* 591 So.2d 550 (Ala.Cr.App.1991) (holding that under the accomplice liability doctrine, a nontriggerman accomplice may be convicted of double murder, a capital offense under § 13A-5-40(a)(10), Ala.Code 1975, only if he had the particularized intent that

both victims be killed). Rather, in order to convict the defendant of the capital offense charged, the State had to prove, beyond a reasonable doubt, that the defendant intended that Clemer Woodall be killed and that she was killed "for a pecuniary or other valuable consideration or pursuant to a contract or for hire." *Sockwell,* supra.

> "'In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. *Faircloth v. State,* 471 So.2d 485 (Ala.Cr.App.1984), *aff'd,* 471 So.2d 493 (Ala.1985).' *Powe v. State,* 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, *Pennington v. State,* 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. *Davis v. State,* 598 So.2d 1054 (Ala.Cr.App.1992). Thus, '[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is *legally* sufficient to allow submission of an issue for decision [by] the jury.' *Ex parte Bankston,* 358 So.2d 1040, 1042 (Ala.1978) (emphasis original).

"The evidence tended to show that the defendant hired Pope expressly to kill the defendant's brother, Elmer Woodall. The evidence further indicated that, although he told Pope that Elmer Woodall lived alone, the defendant was aware that his mother, Clemer Woodall, resided at the house with Elmer Woodall. Pope testified that once he was in Alabama, but

>before committing the shootings, he telephoned the defendant in Kansas and that the defendant told him that the other person at the house was probably his sister from Florida and that 'if she gets in the road she has got to go." Pope said he understood this to mean that whoever was present when the murder took place would have to be killed so that there would be no *659 witnesses. The defendant argues that Pope's testimony on this issue is not believable, but our function is only to assess whether the evidence is legally sufficient to sustain the defendant's capital murder conviction, not to second-guess the jury's assessment of the credibility of the testimony. We conclude that there was sufficient evidence to allow the jury to infer that the defendant hired Pope and intended that Pope, if doing so was necessary to complete his primary task of killing Elmer Woodall, should also kill Clemer Woodall or anyone else present who might be a potential witness to the crime. The defendant's claim on this ground is due to be denied."

  Based on the aforementioned legal authority, the State presented sufficient evidence tending to show that the appellant was criminally responsible for the death of his mother.

   The judgment of the trial court is affirmed.

*Respondents' Exhibit D - Memorandum Opinion of the Alabama Court of Criminal Appeals* at 1-9.

Woodall filed an application for rehearing which the appellate court denied on May 10, 2002. However, he did not further appeal his capital murder conviction by petition for writ of certiorari to the Alabama Supreme Court and the Alabama Court of Criminal Appeals therefore issued the certificate of judgment on May 28, 2002.

Woodall filed this 28 U.S.C. § 2254 petition on May 5, 2003 in which he asserts the following claims for relief:

   1.   The indictment is defective because it is vague and duplicitous.

9

2. The State failed to present sufficient evidence to sustain a conviction for capital murder under a theory of murder for hire of Clemer Woodall, because evidence that Woodall intended for the shooter to kill his mother was insufficient.

3. The trial court erred by overruling Woodalls' objection to the introduction of Pope's and Kennon's prior trial testimony (i) the testimony is unduly prejudicial, (ii) these witnesses were co-conspirators, and (iii) this admission denied Woodall his constitutional right to confront the witnesses against him.

The respondents have asserted the following contentions:

1. Woddal's claims for federal habeas relief are procedurally defaulted due to his failure to present these claims to the state courts in compliance with the state's procedural rules. *See Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002); *Holladay v. Haley*, 209 F.3d 1243, 1254 n. 9 (11th Cir.), *cert denied*, 531 U.S. 1017 (2000); *Collier v. Jones*, 901 F.2d 770, 773 (11th Cir. 1990).

2. Woodall's attack on the constitutionality of the indictment is procedurally barred from review since the petitioner never presented this claim to the state courts during the trial or on direct appeal of the capital murder conviction

        imposed upon him in June of 2001. *See Teague v. Lane*, 489 U.S. 288 (1989); *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999).

3. The claims concerning insufficient evidence and erroneous admission of former trial testimony are procedurally defaulted because Woodall failed to file a petition for writ of certiorari with the Alabama Supreme Court from the appellate court's denial of his application for rehearing on May 28, 2002. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Smith v. Jones*, 256 F.3d 1135, 1140-1146 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136, 122 S.Ct. 1081, 151 L.Ed.2d 982 (2002).

4. Woodall's challenge to the admission of prior testimony based on the ground that co-conspirators testified and his assertion that the testimony violates the Confrontation Clause are procedurally barred from review because the last state court to render judgment deemed these claims procedurally defaulted. *See Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992) (citations omitted) ("Federal review of a petitioner's claim is barred by the procedural-default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides an adequate and independent state ground for denying relief."). On direct appeal of his capital murder conviction, the Alabama Court of Criminal Appeals determined that these claims were precluded from review due to

>Woodall's failure to present them to the trial court during the 2001 proceedings. *Respondents' Exhibit D - Memorandum Opinion on Direct Appeal* at 6.

Upon review of the § 2254 petition, the answer of the respondents, Woodall's response to the answer, and the undisputed record of the state court proceedings, the court concludes that no evidentiary hearing is required and that the petition is due to be denied in accordance with the provisions of Rule 8(a), *Rules Governing Section 2254 Cases in United States District Courts*.

## II.  DISCUSSION

### A.  *Procedural Default In General*

This court may reach the merits of Woodall's procedurally defaulted claims only if the petitioner shows (1) cause for the procedural default and actual prejudice arising out of the violation of federal law, *Coleman v. Thompson*, 501 U.S. 722 (1991), or (2) a resulting fundamental miscarriage of justice if the federal court does not consider the merits of the claims. *Schlup v. Delo*, 513 U.S. 298, 320 (1995).

In his response to the answer of the respondents, Woodall asserts that "application of the applicable procedural default is patently unfair[,]" the deficient indictment claim should not be considered defaulted because he raised this claim within the sufficiency claim on appeal of his 1995 conviction and the Alabama Supreme Court reviewed this claim

"pursuant to the plain error Rule", and *Boerckel* does not bar federal review of his claims.[2] *Petitioner's August 18, 2003 Response - Court Doc. No. 8* at 3-4.

The "patently unfair" argument set forth by Woodall fails to circumvent application of the procedural default bar because it satisfies neither of the exceptions to the bar. Moreover, Woodall's appeal of the 1995 capital murder conviction did not preserve for review issues arising during his 2001 trial; rather, claims related to the 2001 trial and conviction must have been raised during this trial and/or on direct appeal therefrom in order for Woodall to have presented these claims to the state courts.[3]

Finally, contrary to Woodall's argument, *Boerckel* is applicable to his case. *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136, 122 S.Ct. 1081 (2002) ("[T]here is no doubt that Alabama's discretionary direct review procedures bring

---

[2]Woodall relies on *Tucker v. Dept. of Corrections*, 301 F.3d 1281 (11th Cir. 2002) as the basis for this argument. However, *Tucker* is not applicable to the instant habeas petition because its holding is explicitly limited to *Boerckel*'s applicability "to § 2254 petitioners seeking review of Florida convictions" and only "answer[s] a small part of that question." *Tucker*, 301 F.3d at 1281. Specifically, *Tucker* addresses whether the *Boerckel* rule applies to a federal habeas petition challenging a Florida conviction where the petitioner's ability to proceed on appeal to the Florida Supreme Court was permitted only because "the district court of appeal certified a question 'to be of great importance' . . ." *Id*. at 1283.

[3]Notwithstanding its inapplicability to this case, the court notes that Woodall's "plain error" argument is without merit. "[T]he mere existence of a 'plain error' rule does not preclude a finding of procedural default; moreover, the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below. Unless there is some indication that the state court was aware of this issue, we cannot say that the court rejected the merits of petitioner's constitutional claim. A contrary rule would encourage the 'sandbagging' of state courts criticized in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *See Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2647, 91 L.Ed.2d 397 (1986) (possibility of 'sandbagging exists on appeal 'since appellate counsel might well conclude that the best strategy is to select a few promising claims for airing on appeal, while reserving others for federal habeas review should the appeal be unsuccessful.'" *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir. 1988).

13

Alabama prisoner habeas petitions within the scope of the *Boerckel* rule.").

The court has thoroughly reviewed the response submitted by Woodall. The court concludes that he has failed to demonstrate cause for his failure to present his federal habeas claims to the state courts either at trial and/or on appeal of the 2001 conviction in compliance with applicable procedural rules, and he has failed to demonstrate the existence of actual prejudice arising from infringement of federal law. Nevertheless, the court may still reach the merits of his defaulted claims to prevent a fundamental miscarriage of justice.

### B.     *Fundamental Miscarriage of Justice*

The miscarriage of justice standard is directly linked to innocence. *Schlup v. Delo*, 513 U.S. 298, 321 (1995). Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id.* at 315. This exception applies when a petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Schlup v. Delo*, *supra*.

"To establish actual innocence, [a habeas petitioner] must demonstrate that . . . 'it is more likely than not that no reasonable juror would have convicted him.' *Schlup v. Delo*, 513 U.S. 298, 327-328, 115 S.Ct. 851, 867-868, 130 L.Ed.2d 808 (1995)." *Bousley v. United States,* 523 U.S. 614, 623 (1998). "It is important to note in this regard that

'actual innocence' means factual innocence, not mere legal insufficiency. *See Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 2518-2519, 120 L.Ed.2d 269 (1992)." *Id.* at 623-624.

*Schlup* observes that

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. . . . To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.

513 U.S. at 324.

Woodall has failed to make the requisite showing of actual innocence. He has presented no evidence nor suggested that any exists which could satisfy the standard set forth in *Schlup*. Consequently, Woodall's procedurally defaulted claims are foreclosed from federal habeas review.

### III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the petition for habeas corpus relief filed by J. C. Woodall be denied and that this case be dismissed with prejudice. It is further

ORDERED that on or before **August 10, 2005** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the

Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 26th day of July, 2005.

/s/ Vanzetta Penn McPherson
UNITED STATES MAGISTRATE JUDGE